Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good morning. This is Judge Bill Pryor. We have only two appeals to hear this morning. We took another case on the briefs, and we will begin with Younger v. Experian Information Solutions. Counsel for the appellant, are you ready? I am, Your Honor. Okay, Mr. Fetter, you may begin. Thank you, Your Honor. May it please the court, Mayor Fetter representing Experian. Under the FCRA, the requirement to reinvestigate a consumer dispute is triggered when the consumer notifies the agency directly of the dispute. It has to be a direct notification from the consumer. Experian has procedures to weed out purported disputes that don't fit this, that come from someone other than the consumer. The verdict in this case was that having a procedure like that was a willful violation of the FCRA and subject to very considerable punitive damages. There are multiple bases. There's a fair amount of evidence here that those procedures weren't very good. Would you agree? Actually, Your Honor, I would not agree. There's certainly a fair amount of evidence. You don't think a reasonable jury could have concluded that they weren't very good? I think that a reasonable jury could have concluded that, well, I mean, it was clear that there was, they were mistakenly applied to Mr. Younger's case. I think that, frankly, there... A fairly high percentage of these were identified in this process as not having been sent by the consumer. Isn't that right? That is right, Your Honor, but I don't think that that's evidence that the process was poorly designed. I think that, I mean, you know, frankly, the plaintiff didn't put on evidence of, you know, whether any of those were erroneously excluded. The only testimony was that, in fact, this was a big problem that Experian gets a huge number that are not coming from the consumer. Was there any evidence of any improper exclusions besides that of Mr. Younger? There was none. That's exactly right, Your Honor. There was not evidence of even a single other improper exclusion. Experian's witness testified that they get a huge number of these. I think you can also look at, you know, Congress has actually legislated in something called the Credit Repair Organizations Act, basically to sort of restrict these disfavored entities that, you know, have this business model of sending in huge numbers of things or disputes that are not directly from the consumer. What evidence would suggest that there was a good reason under the policy for excluding the plaintiffs? No evidence, Your Honor. I think that there is nothing, you know, it's conceded here that it shouldn't have been excluded. I think if you look at the policy itself and the records... It's more than those that it just shouldn't have been excluded. It seemed to be almost inexplicable how it could have happened. And when you consider how many, what high percentage are excluded, it would seem like a reasonable jury could say, this is a completely haphazard policy. It's hard to imagine how this letter would have been drawn because I think that in any system where you're getting these thousands and thousands of letters, you're always going to be able to find something like this where it was improperly excluded. I think if you look at the policy that is in the records, if you look at, it's around, I think, A465, you know, it's clear that this one wasn't handled properly, but that there is training, there are procedures, and in fact, the testimony was there are two levels of review, right? There's an initial person who reviews it if they're seeing a lot of similar envelopes or this sort of indicia of suspicion, but then they're also supposed to look inside what's included. And then there's a second person who looks at it after it's scanned, and they're supposed to look at it again to make sure that it is properly characterized. So, you know, I actually don't think that there's evidence that it's haphazard at all. I think that had the plaintiff wanted to... Let me ask you this. How, and I'm sorry, I know it's a little tricky when we can't see each other. How are we to look at a policy in light of an exclusion that appears, it appears that Mr. Younger's letter shouldn't have been excluded under the policy. So how does that exclusion reflect the reasonableness of the policy? How do those two things interact in a legal sense for us to look at? Your Honor, frankly, I think that they interact barely, if at all, right? Picking out one particular mishandled letter out of thousands and thousands doesn't tell you anything about the policy as a whole other than that. Obviously, it's not 100% properly applied. It's a legal question whether the policy is a willful evasion of their responsibilities or this particular letter's exclusion was willful. Right. Well... No, I mean that's... Because I think those are two different things. I think that's right, except that, and I think I have to answer both parts of that. I think that what the plaintiff argued and continues to argue, if you look at page 37 of the plaintiff's brief, the plaintiff argued that the whole idea of having a policy like this was improper, that experience is not allowed to... There's no foundation in the statutory text for experience even to try to determine before reinvestigating whether it's coming directly from the consumer. So they're attacking the policy as a whole. And of course, it's important to remember that the way they argued it to the jury, what they were arguing was this whole... I don't know how to characterize it other than to say, well, I won't characterize it, but this argument that based on something that wasn't in evidence, that Experian does this to try to get people to call and sell them things, which they don't defend on appeal, which is based on something that wasn't in evidence, and they were mischaracterizing the thing that wasn't in evidence. So they were arguing that the policy as a whole is evil and designed to make money. And of course, there are other courts that have addressed it and said that, no, it's appropriate to have a policy like this. Now, the second part of your question about whether there could also be an argument that it was willful in his individual case, I think that that wasn't the way they argued it. And if you look at that, there is no evidence here other than to say that it was clearly negligent. But willfulness normally requires, first of all, more than bad or mistaken actions by a sort of lying employee. You would need to show something... Would recklessness be enough? Yes, recklessness would be enough, but I think it would have to be recklessness of the company. It would not be... And the evidence was that Experian receives anywhere from 3,000 to 10,000 pieces of mail every day and employs between 10 and 14 individuals to sort through those thousands of pieces. And identify which should be excluded under the policy as not having been directly received from the consumer. Is that right? Correct, yes. And look, if plaintiffs had wanted to make that case, the plaintiffs could... Let's remember, this isn't a class action of a lot of people saying they're screwing up all the time. This is one person. Plaintiffs could have sought discovery on how often are these erroneous or really anything about the process. At best, I guess you could say that looking at those numbers without any evidence that any of them are being excluded improperly, because again, the testimony is this is a big problem. They get a lot of these. That's why they have the procedure. Even if one... That if they identify letters that are directly from the consumer, they employ a much, much larger number of employees to reinvestigate those matters, right? I mean, hundreds... Well, for sure. The company takes that obligation very seriously. And so, yes, it is... But if you exclude far more than you should, then you avoid employing perhaps thousands of those agents. Well, but I guess if there were some evidence that they were excluding more than they should, then that would be a discussion. But the problem here is our judicial system doesn't work on the notion of saying that, well, without any evidence, whether it was sufficient... We know they exclude. We know that there's evidence that they excluded, but they excluded this plaintiff's letter. Right. No, no, of course. But no system is 100% accurate. So, yes, that's conceded. The question is whether there's any evidence that this was more than... I mean, there isn't even evidence that the system was, let's say, poorly designed or negligent in a broader sense. There was a negligent decision in this case. But to say... They didn't put on any evidence about how many employees they think would be required or any indication that it wasn't enough. Was there any evidence that these non-direct from consumer communications are a problem in Experian's view or are a significant portion of the mail they receive on this topic? Yeah. The Experian's witness testified to a 370 of the record. And again, I mean, I think that the cases Safeco and this court's case has established that there's quite a high burden for establishing a willfulness claim, just sort of having abstract numbers saying without any evidence that it's not working except for one letter is not a willfulness claim. And that, again, is even aside from all of the things that would require a new trial independent of any of that based on the completely improper reliance on this totally extraneous document that was knowingly represented to the jury. It treated as if it were evidence in the centerpiece of the plaintiff's case. What about the district judge's conclusion that Experian didn't take any of the steps that they could have at trial to mitigate that evidence and that having chosen to write it out, there was no opportunity to It's a little hard, frankly, for me to understand that argument. I mean, as I understand it, the idea is that, like, how do you mitigate the use of something that should never be before the jury and is still not put into evidence but is misrepresented by the lawyer basically testifying while it's not in evidence? I mean, plaintiffs say, oh, Experian should have put in, because of plaintiff's misconduct, Experian then should have put in the document that the plaintiff was trying to improperly get in. I mean, that's not a remotely reasonable way of dealing with it. And even if they had, it still wouldn't excuse what happened in summation where, again, this was not admitted into evidence and yet the plaintiff's lawyer made it the centerpiece of his argument to the jury, like, well, the testimony is Experian doesn't do any marketing to people when they call in to say it's a real dispute. And, well, you can believe that or you can believe this settlement with the attorneys general, which, again, was not in evidence. And when you look at the settlement actually it's being blatantly mischaracterized as establishing something that it doesn't remotely establish. So, I mean, how do you mitigate? The settlement blocks those types of communications, but is your argument that that doesn't establish that Experian was making those types of communications in the first place? I mean, yeah, not only does it not establish it, it doesn't even allege it. You know, there is, like, if you go through it, it's a settlement with a bunch of different entities, you know, including Experian is just one of the entities. The only thing in there about this sort of marketing going on is, as I recall, it refers to an anonymous consumer complaint about some credit reporting agency, but not saying which one. It doesn't say that Experian did any of that. So, and it was part of a series of practices. It wasn't, you know, the only focus of the agreement. So, you know, there isn't anything in there that even had it been evidence could have, I mean, there isn't even a good faith basis, frankly, for anyone looking at that and saying that it even alleges that Experian did what its witness said they didn't do. Sorry, Your Honor. I hear him being called. Yeah, I called his time. Yes, his time has expired. Okay. I didn't hear that. I'm sorry. No, we didn't hear that. Yeah. Mr. Fetter, you've saved three minutes for rebuttal. Let's hear from Mr. Green. Thank you, Your Honor. Mr. Green. May it please the Court, let me begin with the point that was raised by Judge Grant, because I think it's the centerpiece of the case. They intended to apply the suspicious mail policy in this case, and they did, in fact, apply. And the point of whether the policy is willful or Younger's exclusion is willful strikes at the heart of this case. The policy itself is not only a willful but an intentional violation of the Fair Credit Reporting Act. Let's start with the statutory text. The statutory text says that a dispute has to be processed unless it's frivolous or irrelevant. There is no exclusion in the statute for a suspicious piece of mail. And indeed, in the context of... It does say that it needs to be a direct contact from the consumer, from the person. Well, that's what triggers the obligation, I would agree, under 1681I. But let's think of that. Well, they would have then the right, would they not? Experian would have the right to determine that something had not been sent directly from the consumer on its face. They would have that right. Two things about that, Judge Pryor. Number one, there's nothing in the statute that says that they've got the right to test that. But even if there were, let's look at it in the context of the 1681I. Their reinvestigation obligation is triggered only by a request that has been directly sent from the consumer, right? So if they determined that this was not, on its face, was not sent directly from the consumer, their obligation hasn't been triggered, has it? I agree with that, the legal obligation under 1681I. But let's think of it in the context of what they say their suspicious mail policy is designed to do, number one. And then number two, what happened here? The suspicious mail policy, they say, is designed to root out claims that don't come directly from the consumer. Well, of course, these categories in the suspicious mail policy, envelope sizes and things like that, have nothing to do with suspiciousness. Beyond that, though... Well, I mean, why not, can't you see if one particular, say, law firm or entity is sending 200 communications at a time in the same envelope with the same typeface and the same return address, isn't that something that a reasonable credit reporting agency could look at and say, looks like this group of mail is not all from, directly from consumers? Not to categorically restrict, no. Because there's nothing in the act that says, saying that it has to come directly from the consumer, there's no definitive law on that that says a statement or a statement sent by a consumer on behalf of or by a lawyer, for example, that that's just categorically out. If the consumer has active involvement in it, there is persuasive authority for the fact that that can be covered. The Walker case, the Ninth Circuit case that Experian relied upon, it's cited and discussed in our red brief. It makes the point of saying, we're confining this case on dismissal to the facts and as alleged, and there was no involvement by the consumer. If there's some involvement by the consumer, that's going to trigger a 1681i obligation. Again, though, let's look at it in the context of the facts of this case and in the context of what 1681i is really reaching toward, which are disputes about line items on credit reports. Okay? A dispute, when a consumer sends in a dispute, the credit reporting agency is the gatekeeper, as the court knows, for all these disputes in the United States. They are the ones, they are the centerpiece of this entire system of challenging erroneous credit reporting. When that happens, when that happens, a consumer is sending in something saying, I have something on my credit report that is wrong. That presumes that the party sending the letter has knowledge of what's on the report. So there's just, you start from the premise that there's something not suspicious about that. Wouldn't you be in a lot stronger position in defending the finding that this was a willful violation if you had some evidence that this policy had excluded erroneously any letter other than your client's? Not necessarily, Judge. And I'll tell you why, for two reasons. Number one, the policy itself, the testimony is, of course, that over 2,000 disputes per day out of the between 3,000 and 10,000 received are getting kicked under the suspicious mail policy. That means potentially on Sunday, two-thirds of the mailings coming in are getting kicked. The logic only tells you that a number of those are legitimate disputes. Beyond that, the Williams case... Does logic tell us that or does evidence tell us that? I mean, the other side has evidence that this is a problem. I'm sorry. I apologize for talking over you on the phone. The reasonable inference from the evidence is just that the court can look to, and we probably should have submitted this supplemental authority. Williams v. First Advantage is a new case from about, I guess, 12 weeks ago now by this court, Judge Julie Karnes writing, and it is a compendium of punitive damage law, and it is also a compendium of law on FICRA willfulness, upholding a substantial compensatory and punitive damage verdict, remitting the punitive damages, almost, if you read the various opinions by quotient verdict, as it were, among the judges, but its point is in that case, they cite to the fact that the failure to show in that case that the actual practice that led to the FICRA violation did not result in any other violation was not per se indicative of a lack of willfulness or certainly did not exclude the inability to recover punitive damages or anything like that because logic could tell otherwise, and that's so even in that case and the fact of that case, and I'll give the court to cite 947 Fed Third 735. In that case, what we're dealing with in that case is an erroneous report regarding prior criminal convictions in a credit report, and what was happening was LexisNexis, the LexisNexis affiliate had a screening process under which for common names, people with common names, they required three markers in their policy, three identifying match markers in order to attribute a criminal conviction from the public records to someone. The evidence in the case was in actual practice, they didn't follow that policy. They just said two was good enough, and so, of course, an erroneous criminal conviction was... Mr. Green, question for you, Judge Jung. Yes. Okay, it's a given that this was a mistake. Now, isn't your proof, really your sole proof of willfulness of your client's violation, willfulness under safe code, isn't it really two things? You're arguing an inference from the volume of mail that's kicked out, okay, without any proof about what's in it, but an inference, and of course, if they answered a third party's, not a first party's, they'd probably get sued for not holding it to the first party request, but number one, you have an inference based on the volume that's kicked out. Secondly, wasn't a great portion of your willfulness proof this questionable presentation that your lawyer, your trial lawyer made about this consent decree, which I've read, which says nothing about the defendant marketing, the defendant marketing to customers when they send in these letters, using these letters. That marketing is mentioned, but there's no real honest argument that that consent decree establishes that this defendant used this to market, and of course, it was limited out, and I understand your point about non-preservation. Other than those two points, okay, the volume and this inference that you argued from the consent decree, which I don't think was particularly square on what the decree said, what are the proof, hard proof, is there of willfulness, that your guy's letter was willfully, recklessly moved to the reference pile? Number one, the policy was applied as intended. Ms. Messvin, their corporate representative, testified at trial that they followed their S&P, that's document 129 at 118 and 19, and document 129 at 135. She says, we know it fell under the S&P, that's why. So this notion that there was a mistake is wrong. It's simply wrong. They properly applied their S&P as it is written. The policy itself is the violation, and that's really what distinguishes this case actually and amplifies the reprehensibility status from the Williams case, the recent Williams case, is that we're not dealing with a deviation from policy here. The policy is the problem. What experience policy required this letter to be excluded? What was it? It's not that it requires it, it allows it. So that's different. It was a mistake. You can't tell me, or can you, that there's a particular provision in this policy that kicked this letter? Yes, the policy gives the mail clerk discretion. I agree. And under this policy, the mail clerk, he or she, can kick any piece of mail I submit to the court that comes into the mailroom. No one has ever said. I'm sorry. Based on these criterion, we all agree it was a mistake. It was kicked by a mistake. But you can't tell me there's a particular criterion that would cause this letter to be kicked other than the discretion given to the employees. This policy gives the mail clerk discretion to kick any piece of mail that falls in. But if you're looking for further evidence of intent, just look at document 124-2, which is the response letter. It says this. It tells the consumer this, we received a suspicious mail, request in the mail regarding your personal credit report, and determined that it was not sent by you. And then this is the kicker. Suspicious requests are reviewed by Experian security personnel. That's just a false statement. Testimony is admitted to that in the case. Who work regularly with law enforcement officials and regulatory agencies. Another false statement in the case. To identify fraudulent and deceptive correspondence. So the S&P response contains three false statements in it. And beyond that, it's not just... Doesn't it also contain a very simple way for the person to reach back out to Experian and confirm that the communication was directly from them? A way that violates the act. That's the problem. The act is violated when they don't process the dispute. The consumer doesn't have to call in. And of course, as we know, and it has been pointed out already, the processing of disputes is an expensive business for Experian. Independent of the 31AG agreement, and I'll address that momentarily, it is an expensive proposition. 600 dispute agents are employed. If they process the additional 2,000 per day that are coming in, imagine how many more people they would have to employ. And that really goes to the question of what is the appropriate amount of punitive damages to force them to change this policy? Because they have... The problem is that we don't have any evidence that those 2,000 exclusions were improper. Maybe they were, maybe they weren't, but we don't have evidence either way. A dispute of a credit reporting entry, a dispute of a credit reporting entry, which is going to be the lion's share of what comes in to any credit reporting agency. I've got something wrong on my credit report. Those are all going to be not suspicious in their own right. Because, again, when a consumer sends in a credit reporting dispute, they know what's on the report. There's nothing suspicious about that to start with. You're just... It's not the consumer saying, hey, send me a copy of my credit report. That's a different situation. A 1681I situation is a situation in which the consumer is saying, hey, I've got an erroneous entry on my report. That's a different ballgame. Now, back to Judge Jones' question on the inference from the consent decree. I think this is worth pointing out. At the end of closing, Experience Council tried to turn it around on the plan and said this. Interestingly, you haven't heard anybody come in here and say, I'm the person who decided this was the policy, and we're going to have to have it because it's going to make us a lot of money. You've heard Mr. Seals speculate about that. But I suggest to you, there's a reason you haven't seen that. They were trying to find that out and couldn't. So, they tried to tactically at trial, skillfully, turn that around on the plaintiff and say, they didn't put the 31AG agreement in evidence for a reason. They didn't want to show you that. And that didn't work. And now they're complaining it's so bad, they're entitled to a new... All right. Two more quick questions. Mr. Green, do you... Is it your view that the way you all was square? And it was in lemonade out. It came in, I think, without any mention to the judge. I understand you contend that the defense lawyers didn't defend against it. Are you saying that the inferences you offered it for the jury and your arguments and questions was square with what the facts were? Is that what you're saying? Square and 100% square. Okay. Next point. Next question. According to the judge's order, you all, your client sent this contest letter in March the 30th. So, say it got there, you know, April 1st or 2nd. Okay. Before you served your lawsuit on June 10th in the normal course of business, not because of this lawsuit, at least that normal course of business is what Judge Cornelia said. Before you served your lawsuit, they corrected this problem. Apparently on their own bat, if it's in the normal course of business, as Judge Cornelia said. So, about roughly, you know, two months and a week on their own bat, they corrected this. Does that suggest one way or the other willfulness? Does that impact our look at willfulness here? No, it does not. And the reason is that their obligations under FCRA are independent of whether the furnisher cleans up the trade line after the fact. And by the way, the judgment was back in January. It's not like he got a judgment and the next day turned around. What I'm saying is they, on their own, in the regular course, they clean this up before you something must have picked that up in the normal course and cleaned it up. I agree with you. Typically, in the normal course, down the road, a furnisher probably cleaned up the trade line. That's generally what would happen if the furnisher is on the ball. But, you know, particularly when they have gotten sued, a consumer wants that off their report promptly. Right. So, it took 70 days, even by everyone's likes, it took 70 days in the normal course for that to be cleaned up. Well, that is not by Experian's action, though. That's by the furnisher. There's no evidence in the record that Experian did something to clean that trade line. I think you're out of time, but I've got... Go ahead. I don't think it's time to keep going. Finish if you like. I've got one question, if I may. Is it your position that any policy by Experian would be disallowed under the statute? It's my position that a... Well, ultimately, that's not the question here. Well, I know. It's my question. Suspiciousness is not a criteria. If there were some... If we were dealing with a policy that was narrowly tailored to trying to root out truly suspicious requests, for example, send me my credit report, okay, when there's some... Let me be clear. Since your time is up, I want to keep this short. Do you think that a reasonable policy would be permitted under the statute? I think it's potential that a directly... Because of the word directly, a policy could be used if it were truly designed to root out something suspicious. This is not that. What about this, Mr. Green? What if the policy was that a letter from a consumer that's from the consumer can be excluded and you send out this kind of letter of communication that they do that says, look, we've got this. We don't think it's directly from you. Let us know if it is. Again, I think it's possible if you read directly very broadly, then it's certainly possible. But a policy that allows for exclusion under any scenario where any piece of mail could be excluded... And bear in mind, no one has ever said that we have misread the policy, mischaracterized it. That's not the way it's applied in actual reality. The policy would exclude... We let you go over a fair amount, Mr. Green. Sorry. Thank you, Your Honor. It's okay. We did the same with your adversary. So we're going to... We'll hear a few minutes of rebuttal from Mr. Fetter. Thank you, Your Honor. Let me start just quickly with where Mr. Green just left off, which is saying that no one says that they're mischaracterizing the policy or have it wrong. I very much do say that. I invite the court to look again at like it's a 250... I'm sorry, 460 for a 465. If you look at the policy, Mr. Green is saying that, well, there's unbridled discretion. If the envelope is excluded, it's not what the policy says. If you look particularly at 465, it specifically says you're supposed to look at what is included in the envelope and that if there are attachments, for example, that show that the consumer personally participated, then they're supposed to not treat it as a suspicious letter. Obviously, that didn't happen here. Mr. Fetter? Yes. As I understood what Mr. Green was arguing, though, was that your own corporate representative testified that this letter, which you admit should not have been excluded, was nevertheless excluded because of the policy. The policy was applied, excluded it, and you recognize that that should not have happened. That was wrong, but your corporate representative really couldn't explain why. Well, Your Honor, I think what you're asking is an important question, and let me speak to that because I don't think that that's actually... Mr. Green is saying that the representative testified that it was properly excluded under the policy, like that this worked as intended. That wasn't the testimony. I would look at A243 of the record. She was saying it was excluded pursuant to the policy, like that's how it happened, but at the same time, she was saying it was wrongly excluded. If you look at the policy itself, it clearly under the policy shouldn't have been excluded. My concern is putting a say, well, it looks like the policy excluded intentionally something that it shouldn't have. I don't think actually a reasonable jury could have, but since my time is... And I invite the court to look at that testimony, but just very quickly here, the other point I wanted to make is just on the 2,000 per day, that whole argument is premised or based on the assumption that it can't be that Experian gets that many letters that aren't directly from the consumer. The problem is there's no basis for that assumption. There are a lot of credit repair organizations out there. There are fraudsters out there, and the only testimony at 255 of the appendix, she said Experian receives thousands of pieces of mail each day that claim to be from particular consumers, but are actually from third parties. So there's no basis for the assumption, and the only actual testimony is to the contrary. Okay. Are there any more questions for Mr. Fader? Very quickly, Mr. Fader, your 415 letter back to Mr. Younger, your colleague says it contained false statements. So is that true? And if so, then why couldn't the jury hang their and look into that because that really was not a focus of the case? I think that, as I recall the testimony about it, there were statements about working with law enforcement that Experian did, in fact, work with law enforcement to try to identify what were letters that might be indicia of fraud or things like that. I'm not having the text in front of me. I can't tell you word for word everything in there. I don't think though that certainly that wasn't how the case was tried. No, I don't think that that was a basis for the assumption. It's not a requirement about what goes in the letter. Okay, Mr. Fader. I think we understand your case, and we'll take it under submission and move to the next case. Thank you, Your Honor. Thank you.